# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Pink Apple iPhone, seized from the person of Megan Rae BOWMAN on February 9, 2023<br>("Target Device") | Case No.   **23-mj-00686** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 841, 846 | Distribution of Controlled Substances and Conspiracy to Do the Same |
| 21 U.S.C. Sec. 841(b)(1) | Distribution of Controlled Substances Resulting in Death |

The application is based on these facts:
See attached affidavit of Task Force Officer Scott Rossall, Homeland Security Investigations.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Scott Rossall, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: 03/01/2023

*Judge's signature*

City and state: San Diego, California    Honorable Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

## Attachment A
### *Item to be Searched*

The item to be searched is as follows:

Pink Apple iPhone, seized from the person of Megan Rae BOWMAN on February 9, 2023

(" **Target Device** ")

The **Target Device** is currently in the custody of Homeland Security Investigations at 880 Front Street, Suite 3200, San Diego, California 92101.

## Attachment B
### *Items to be Seized*

Authorization to search the **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, between the dates of June 13, 2022, and February 10, 2023:

a. tending to indicate efforts to distribute federally controlled substances and conspire to do the foregoing;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution of federally controlled substances and conspire to do the foregoing;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances and conspire to do the foregoing;

d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances and movement of cash proceeds, such as stash houses;

e. tending to identify the user of, or person(s) with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of 21 U.S.C. §§ 841(a), 841(b)(1), and 846.

## AFFIDAVIT

I, Scott Rossall, being duly sworn, hereby state as follows:

### I

### INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic device:

> A pink Apple iPhone, seized from the person of Megan Rae BOWMAN on February 9, 2023
>
> ("**Target Device**")

as further described in Attachment A, and to seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841(a), 841(b)(1), and 846, as further described in Attachment B. The requested warrant relates to the investigation and prosecution of BOWMAN and others known and unknown for criminal violations of the offenses identified above. *U.S. v. Megan Rae Bowman*, 23CR273-RBM. The **Target Device** is currently in the custody of Homeland Security Investigations at 880 Front Street, Suite 3200, San Diego, California 92101.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other agents regarding this investigation. All dates and times described are approximate.

### II

### EXPERIENCE AND TRAINING

3. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18 of the United States Code. As such, I am empowered by law to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. 2516. I am a Task Force Officer with Homeland Security Investigations.

4. I have been a Peace Officer employed by the San Diego County Sheriff's Department for about eleven years. I have been awarded an Advanced Certificate by the California Commission on Peace Officer Standards and Training (POST). I am currently assigned to the High Intensity Drug Trafficking Area unit, and have been for over three years. Prior to my current assignment, I was assigned to the Vista COPPS West Unit for approximately one year, the patrol division of the San Marcos Station for about three years, and the San Diego Central Jail for about three years. During my career, I have investigated numerous cases involving illicit controlled substances in San Diego County. I have received formal and informal training in excess of three hundred hours specific to controlled substance investigations. I have arrested more than fifty people for drug related offenses. I have interviewed, or been present during the interviewing of, over five hundred subjects involved in the usage and/or sales of controlled substances.

5. Furthermore, I have attended an eighty-hour ICI Core Course, an eighty-hour POST Narcotics Investigations Course, and an eight-hour POST 11550 H&S Evaluation Course. I have been a member of the California Narcotics Officers Association and the International Narcotics Interdiction Association. I have attended a forty-hour Clandestine Laboratory Investigations course and a "Live Cook Methamphetamine Class"; both courses related to the manufacturing, usage, and packaging of methamphetamine and were instructed by the DEA. I have attended a thirty-two-hour Homeland Security Investigations training course where I received Title 19 enforcement authority as a federally-cross-sworn HSI Task Force Officer.

6. During the course of my duties, I have become familiar with the manner in which controlled substances are packaged, marketed, and consumed. During the course of my duties, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of traffickers in controlled substances as practiced locally. I have participated in the service of numerous search warrants involving controlled substances, possession of controlled substances, and possession of controlled substances for sale. I have conducted surveillance on known

controlled substance dealers, as well as numerous occasions where I have observed controlled substances being sold to informants. I have spoken with numerous informants regarding controlled substance trends. I have also testified in court as an expert witness for the trafficking and possession of illegal drugs for sale.

7. The following is based on my own investigation, oral and written reports by other law enforcement officers, debriefs, database and public records checks, searches, phone analysis, and other investigation. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

8. Based upon my training and experience, consultations with other law enforcement officers experienced in narcotics investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Individuals involved in the sale and distribution of narcotics often work in concert utilizing cellular/mobile telephones to communicate because they are mobile and provide instant access to calls, text messaging capabilities, social-media applications with messaging functions, web, and voice messages.
   b. Individuals involved in the sale and distribution of narcotics often maintain a digital contact list in their cellular/mobile telephones which could, and likely would, lead to the identification of co-conspirators in the illegal drug trade.
   c. Individuals involved in the sale and distribution of narcotics often use cellular/mobile telephones to arrange the storage and distribution of their drugs.
   d. Individuals involved in the sale and distribution of narcotics often use cellular/mobile telephones to arrange meetings to sell drugs, to acquire drugs for sales, to provide payments for drugs sold, to receive drugs for storage at "stash house" locations, and other activities germane to drug distribution.

e. Persons in control of digital devices leave evidence of their identification such as photographs, documents, emails, and text correspondence. Such described dominion and control evidence is vital to proving control over the described property to be seized and may also exist on the **Target Device**.

9. Based upon my training, experience, consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the distribution of narcotics may yield evidence:

a. tending to indicate efforts to distribute federally controlled substances and conspire to do the foregoing;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution of federally controlled substances and conspire to do the foregoing;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances and conspiracy to do the foregoing;

d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances and movement of cash proceeds, such as stash houses;

e. tending to identify the user of, or person(s) with control over or access to, the **Target Device**; and/or

    f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## FACTS SUPPORTING PROBABLE CAUSE

10. At about 10:30 a.m. on December 5, 2022, M.K. was found unresponsive and face-down, with obvious signs of death, in a trailer in Ramona. M.K. was last seen the prior morning. Ramona CAL FIRE and Medics responded to the scene, and M.K. was pronounced dead at 10:54 a.m. The Medical Examiner later arrived and took over the death investigation.

11. On December 5, 2022, Deputy Wick was dispatched to the report of a death at a trailer on Alice Street in Ramona. When he arrived, Deputy Wick and fellow law enforcement were directed to the body of M.K., which was lying face-up on the floor of the trailer, just inside the door. M.K. showed obvious signs of death: his face and knees had a bluish tint, and he exhibited rigor mortis. Deputy Wick also saw a lighter, aluminum foil, and a short straw he recognized as one used to smoke controlled substances near M.K.'s head. Deputy Wick also saw a tin box in the trailer and saw that it contained a white powdery substance that he recognized as consistent with fentanyl. Deputy Wick and I searched the trailer and found two phones. They also found a small bag containing a crystalline substance consistent with methamphetamine. Subsequently, Deputy Wick conducted testing on the crystalline substance and found it tested presumptively positive for the presence of fentanyl and weighed about .35 grams. As of the date of this application, I am aware that initial blood screening showed that M.K.'s blood showed the presence of fentanyl, amphetamines, and cannabinoids; a final toxicology report is pending.

12. Deputy Nassir also responded to the report of a death at the trailer. At the trailer, Deputy Nassir interviewed two people, D.S. and R.F. In substance, D.S. told Deputy Nassir that D.S. had gone to check on M.K. that morning, because M.K. had not been responding to text messages or phone calls. When D.S. arrived at the trailer, D.S. forced

entry into the trailer and found M.K. deceased. D.S. found M.K. face-down, laying between the bed and the wall of the trailer. M.K. appeared to have trauma to the head and was bleeding from the mouth; it appeared to D.S. that M.K. had died of an overdose. Deputy Nassir also spoke with R.F., who explained that M.K. had been living in a trailer on R.F.'s property, and that R.F. had found M.K. in the trailer with D.S. R.F. allowed people to live on R.F.'s property as a condition of their making efforts to obtain and maintain sobriety from drug use; M.K., who I understand had a history of drug addiction, was living there at the time of death.

13. I also responded to the overdose scene. As part of my investigation, I gathered the phone plugged into a wall outlet next to M.K's bed. Subsequently, I spoke with a friend of M.K.'s, C.H., who told me that M.K and C.H. had shared PINs for their phones as a means of holding each other accountable in their efforts to stay sober. C.H. provided me with a four-digit number that C.H. thought could be the passcode for M.K.'s phone, and I was able to successfully unlock the phone with the code. Given that the phone was in the trailer, and that C.H. was able to provide the passcode, I infer that the phone I reviewed was M.K.'s.

14. In my review of M.K.'s phone, I found a series of communications between M.K. and a contact saved as, "Meghan_pb Tim." The conversation thread between M.K. and "Meghan_pb Tim" began on October 4, 2022. I ran records checks on the number associated with this contact and found that BOWMAN has been the subscriber since February 26, 2022. I also learned that following an arrest on July 13, 2022, for distributing controlled substances, BOWMAN identified this phone number as hers. In the course of that arrest, I learned, BOWMAN admitted to law enforcement that she had "middle-manned" a sale of "Fettys" the night before the arrest. I am aware that in this context, to "middle" or "middle-man" a transaction generally means a person connects a source of supply with a customer for the drugs. I further note that BOWMAN's admission of helping conduct a transaction for "Fettys" is, I believe, a further indication that she has been involved in drug deals for the distribution of fentanyl.

15. In my review of the text conversations on M.K.'s phone, I found communications between M.K. and BOWMAN; I have reproduced several excerpts of those communications here, along with my observations about them, made in light of my training and experience.

<u>November 8, 2022 (Beginning 1:40 p.m.)</u>

| | | |
|---|---|---|
| M.K: | Yoo | |
| BOWMAN: | What's up | |
| M.K: | Chilling. U got fet? | |
| BOWMAN: | Yes | |
| M.K: | Wya | |
| BOWMAN: | We r in Claremont and need a ride to sycuan. We gotta room there for 2 nights | |
| M.K: | U got fet on u | |
| BOWMAN: | Yeah | |
| BOWMAN: | How much u want | |
| M.K: | If so I'll give u a ride | |
| BOWMAN: | Well I gotta ride if not I need the cash | |
| BOWMAN: | But if u wanna come thro u can but at the moment I'm in Claremont | |
| BOWMAN: | If you wanna gram instead of 80 I can give it to you for 60 | |
| M.K.: | It's 2 hours and 10 mins to Claremont | |
| BOWMAN: | Whatttt?? | |
| BOWMAN: | By kerny mesa | |
| M.K.: | Let me check | |
| M.K.: | I think it said by la | |
| BOWMAN: | [redacted] | |
| BOWMAN: | Nooo | |
| M.K.: | Lol nvm it's 45 minutes | |

| | | |
|---|---|---|
| 1 | M.K.: | That's a lot more doable |
| 2 | M.K.: | Ok so I'll be there around 3? |
| 3 | M.K.: | Ok? |
| 4 | BOWMAN: | Lol okay so u want the g for 60 |
| 5 | BOWMAN: | It's normally 100 |
| 6 | M.K.: | Yeah |

16. In this exchange, I believe M.K. asked BOWMAN if she had fentanyl; I note that M.K. requested "fet," which I know is a common shorthand for "fentanyl." I believe that in response, BOWMAN and M.K. negotiated the sale of a gram of fentanyl for $60. Further, I assess that BOWMAN and M.K. agreed for M.K. to meet her at a location in Claremont to purchase the gram.

November 12, 2022 (Beginning 11:07 a.m.)

| | | |
|---|---|---|
| 13 | M.K.: | Hey |
| 14 | BOWMAN: | What's up |
| 15 | M.K.: | U good |
| 16 | M.K.: | Just like a half g |
| 17 | BOWMAN: | Yeah I have that |
| 18 | BOWMAN: | I'm in La mesa |
| 19 | M.K.: | Wya |
| 20 | M.K.: | Bet |
| 21 | M.K.: | You gonna be there for a few? |
| 22 | M.K.: | What's the address |
| 23-24 | BOWMAN: | [redacted] and [redacted]'s mom is picking us up at 3 but we r just going to the pokemen card store |
| 25 | M.K.: | Lol is that in LA Mesa too |
| 26 | M.K.: | Cuz I'll leave Ramona in like 20mins |
| 27-28 | BOWMAN: | Possibly if u wanna wait til traffic dies down we r going to come back to our location now |

8

| | | |
|---|---|---|
| M.K.: | | Well I got to meet someone at 530 so I'd rather see yall asap |

17. Here, I believe that M.K. asked if BOWMAN was able to sell M.K. half a gram of a controlled substance; from the context, I infer that drug could well have been fentanyl. I further note that M.K. said that M.K. would be coming from Ramona to pick up the half-gram, which I take as further corroboration that M.K. was the person communicating with BOWMAN on these occasions.

<u>November 29, 2022 (Beginning at 9:30 a.m.)</u>

| | |
|---|---|
| BOWMAN: | Hey you need anything? |
| M.K.: | No I'm good |
| M.K: | No money |

18. Here, I infer that BOWMAN was asking M.K. if M.K. wanted to purchase anything; I infer that this was an offer to sell drugs. M.K. responded that M.K. was not able to purchase at that time, because M.K. did not have money for it.

<u>December 3, 2022 (Beginning at 11:16 a.m.)</u>

| | |
|---|---|
| BOWMAN: | Hey I'm on deck rn |
| M.K.: | Wya |
| BOWMAN: | Old town |
| M.K.: | Damn |
| BOWMAN: | Right next to fashion valley |
| BOWMAN: | Wanna come thro we have to leave this hotel asap |
| M.K.: | Where yall going |
| BOWMAN: | Idk |
| M.K.: | I'm working till 1. I can come down after |
| M.K.: | But I can't just ride around |
| BOWMAN: | Aye if you can send me 70 I'll give u a gram . It's so I can renew the room |
| M.K.: | I'm working |

| | | |
|---|---|---|
| 1 | M.K.: | What's the address |
| 2 | M.K.: | I don't have 70 tho I got 40 |
| 3 | BOWMAN: | [redacted] |
| 4 | BOWMAN: | That would help |
| 5 | BOWMAN: | Ru coming thro ? |
| 6 | BOWMAN: | We have a hotel rn but I have to renew it right now |
| 7 | M.K.: | I'm omw but it's 50 mins away |
| 8-9 | BOWMAN: | Is there any way you could pay pal that $40 so we can keep the room and kick it here |
| 10 | M.K.: | I only have venmo |
| 11 | M.K.: | I'm 38 mins away |
| 12 | M.K.: | 20 mims |
| 13 | M.K.: | 10 |
| 14 | BOWMAN: | Ru here? |
| 15 | M.K.: | Yea |
| 16 | M.K.: | What should i do |

19. Here, I believe BOWMAN told M.K. that she had drugs available to sell; I am aware that when dealers use the phrase, "on deck," it typically means they have drugs available to sell. Further, I note that BOWMAN offered to sell M.K. a gram for $70; this is consistent with the transaction I identified earlier, and I take it as evidence that BOWMAN was offering to sell M.K. a gram of fentanyl powder. In my view, the conversation further shows that M.K. agreed to make the purchase and had to drive to BOWMAN at a hotel after M.K. finished work. I note that the in the final set of exchanges, it appears M.K. was providing updates on M.K.'s travel to BOWMAN, and that it ended with M.K. at the hotel where BOWMAN was then staying. I further note that this last conversation occurred on December 3; as noted, M.K. was found dead from an apparent overdose on the morning of December 5.

20. The communications on December 3 identified the address of the motel where BOWMAN was staying (which I have redacted here). I visited this motel and obtained a copy of the registry for December 2, 3, and 4 of last year. In my review, I found that BOWMAN was a registered guest for those days. I also found that one T.M. was also a guest during that time period; from prior arrest reports, I have found indications that BOWMAN and T.M. are romantically linked. I take this evidence of BOWMAN's stay at the motel as additional corroboration that she is the person who was selling fentanyl to M.K., as I believe the foregoing communications indicate.

21. Further, I was able to obtain and review security footage from this motel; that footage shows that on the afternoon of December 3, a woman matching BOWMAN's appearance met M.K. in the parking lot and walked with M.K. up to the room she was staying in. This occurred contemporaneously with BOWMAN's text-message question to M.K., "Ru here?" (i.e., "are you here?") and M.K.'s confirmation that M.K. was present. The footage indicates that M.K. stayed in BOWMAN's room from about 12:49 p.m. to about 2:21 p.m. At that point, M.K. came out of the room and returned to M.K.'s vehicle. About six minutes later, BOWMAN came out of the room and walked down the exterior stairs, pausing near the stairs. Several minutes later, a man matching the appearance of T.M. came out of the room and spoke to BOWMAN from the second-floor banister. T.M. briefly went back into the room and then came out, and both he and BOWMAN got into M.K.'s vehicle. The three drove away from the motel.

22. On February 9, 2023, BOWMAN was arrested. During a consent search of BOWMAN prior to her arrest, I found the **Target Device** in BOWMAN's purse. During the search, BOWMAN identified the **Target Device** as her cellphone. During a post-*Miranda* interview, BOWMAN admitted to selling fentanyl and furnishing illegal drugs to M.K. on several occasions. BOWMAN also admitted to selling M.K. fentanyl powder and using fentanyl with M.K. on the afternoon of December 3, 2022. During this post-*Miranda* interview, BOWMAN provided the phone number for the **Target Device**. The phone number provided by BOWMAN was identical to the phone number stored in M.K.'s

11

cellphone contacts as "Meghan_pb Tim." BOWMAN also provided a passcode for the **Target Device**.

## IV
## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

23. Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all facts and opinions set forth in this affidavit, I know that:

   a. Individuals involved in drug distribution activity use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the **Target Device** will enable investigators to establish further evidence of drug distribution, and co-conspirators. That evidence is, I believe, likely to include information pertinent to the distribution of controlled substances.

   b. Cellular telephones and electronic communication devices (Tablets, I-Pads, etc.) are capable of storing many different types of data that are invaluable to investigators and could be evidence of criminal conduct. This data, sought pursuant to the requested search warrant, consists of the contents of the cell phones' or electronic communication devices' memory, including: stored names and telephone numbers in the memory, "phonebook" or list of contacts, and/or speed dial functions of the phones; phone numbers dialed for the most recent outgoing or "sent" calls of the telephones, along with date and time of call data; phone numbers dialing the telephones for the most recent incoming "received" calls, along with date and time of the call data; phone numbers dialing the telephone for the most recent "missed" calls, along with the date and time of call data; GPS navigation information; internet searches and websites viewed; and deleted data.

   c. Individuals involved in the sale and distribution of narcotics commonly use cellular telephones, blackberries, PDAs, electronic communication devices,

other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates, and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. c. Individuals involved in the sale and distribution of narcotics also commonly store records of the business of distributing and selling drugs on telephones, computers, and other forms of digital media.

    d. In addition to their use of computers and digital media, persons involved in the distribution and sale of narcotics often use mobile phones in furtherance of these activities. When used in this manner, the mobile phones typically contain data constituting evidence of these activities. Many current mobile phones are sophisticated computing devices and are capable of performing many of the same functions as computers. They are commonly used in furtherance of illicit activity in the same manner as computers.

24. Here, in light of the investigation to date, I seek authority to search the **Target Device** from June 13, 2022, through February 10, 2023. Evidence shown here indicates that BOWMAN has been a supplier of controlled substances – particularly fentanyl – for some time. Given the length and nature of BOWMAN's apparent activity, I submit that review of the **Target Device** for this period of time reflects a conservative estimation of her possible distribution activities. I further seek authority to search the **Target Device** to the day after her arrest because I am aware that when an individual engaged in the sale of narcotics is arrested, customers and co-conspirators do not always learn of the arrest right away and can try to reach out to the arrested person.

25. To date, investigators have not attempted to acquire the contents of the **Target Device** by other means.

//

# V
# PROCEDURE FOR ELECTRONICALLY STORED INFORMATION

26. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, agents will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and the memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## VI

## CONCLUSION

29. Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists to conclude that the **Target Device**, as further described in Attachments A, incorporated herein, was utilized to facilitate violations of Title 21, United States Code, Sections 841(a), 841(b)(1), and 846. Furthermore, I believe there is probable cause to conclude that the **Target Device** contains stored data that constitutes evidence, fruits, and instrumentalities of such violations, and I respectfully request warrants be issued authorizing a search for and seizure of that data, as further described in Attachment B, incorporated herein. For the reasons provided, I seek authority to search the **Target Device** from June 13, 2022, through February 10, 2023.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Task Force Officer Scott Rossall
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 5.1 this 1st day of March, 2023.

The Honorable Allison H. Goddard
United States Magistrate Judge

15

## Attachment A
### *Item to be Searched*

The item to be searched is as follows:

Pink Apple iPhone, seized from the person of Megan Rae BOWMAN on February 9, 2023

("**Target Device**")

The **Target Device** is currently in the custody of Homeland Security Investigations at 880 Front Street, Suite 3200, San Diego, California 92101.

## Attachment B
### *Items to be Seized*

Authorization to search the **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, between the dates of June 13, 2022, and February 10, 2023:

a. tending to indicate efforts to distribute federally controlled substances and conspire to do the foregoing;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution of federally controlled substances and conspire to do the foregoing;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances and conspire to do the foregoing;

d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances and movement of cash proceeds, such as stash houses;

e. tending to identify the user of, or person(s) with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of 21 U.S.C. §§ 841(a), 841(b)(1), and 846.